UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLEN R. BASE,<br><br>    Plaintiff,<br><br>  v.<br><br>FCA US LLC,<br><br>    Defendant | **ORDER RE SUMMARY JUDGMENT MOTIONS AND MOTIONS TO EXCLUDE**<br><br>Case No. 17-cv-01532-JCS<br>Re: Dkt. Nos. 74, 75 |
| JOSE VALENZUELA DE LEON et al.<br><br>  v.<br><br>FCA US LLC,<br><br>    Defendant | Related Case No. 17-cv-1541-JCS<br>Re: Dkt. Nos. 72, 73 |
| KRISTI M. OBRIEN et al.<br><br>  v.<br><br>FCA US LLC,<br><br>    Defendant | Related Case No. 17-cv-04042-JCS<br>Re: Dkt. 60, 62 |
| JESUS BOYZO et al.<br><br>  v.<br><br>FCA US LLC,<br><br>    Defendant | Related Case No. 17-cv-04154-JCS<br>Dkt. Nos. 57, 58 |

## I.  INTRODUCTION

Plaintiffs in these related cases[1] purchased vehicles from FCA USA LLC ("FCA) that were factory-equipped with a Totally Integrated Power Module known as the TIPM-7.  Plaintiffs allege that this component was defective and that at the time they purchased their vehicles FCA knew that it was defective but failed to disclose that information to them.  Plaintiffs further contend FCA failed to promptly offer to repurchase their vehicles after it became apparent that the vehicles were defective.   Based on these allegations, Plaintiffs in all of the related cases assert claims for breach of express and implied warranties under the Song-Beverly Consumer Warranty Act ("the Song-Beverly Act") and for fraudulent inducement.  FCA brings motions for summary judgment and to exclude expert testimony in each of the related cases, which are presently before the Court.  A hearing on the motions was held on March 8, 2019.[2]

## II.  BACKGROUND

### A.  The Complaints

Between 2012 and 2014, Plaintiffs purchased new vehicles from FCA that were factory equipped with the TIPM-7.  *See Base* Complaint ¶¶ 9, 12 (alleging that Plaintiff Galen Base purchased a 2012 Dodge Ram 2500 on December 16, 2012 and that it was equipped with the TIPM-7); *Valenzuela* Complaint ¶¶ 9, 11 (alleging that Plaintiffs Jose Valenzuela de Leon and Jessica Fuentes Valenzuela purchased a 2014 Jeep Wrangler on September 20, 2014 and that it was equipped with the TIPM-7);  *O'Brien* Complaint ¶¶ 8, 11 (alleging that Plaintiffs Kristi M. O'Brien and John D. O'Brien purchased a 2012 Jeep Grand Cherokee on January 29, 2012 and that it was equipped with the TIPM-7);  *Boyzo* Complaint ¶¶ 9, 12 (alleging that Jesus and Maria Boyzo purchased a new 2013 Dodge Grand Caravan on March 6, 2013 and that it was equipped with the TIPM-7).  Plaintiffs allege that the vehicles they purchased had serious defects associated

---

[1] Case No. 17-cv-4294 JCS, *Perez v. FCA US LLC*, and Case No. 17-cv-1458 JCS, *Bratton v. FCA US LLC*, are related to the cases listed in the caption of this Order but have settled.  In this Order, references to "the related cases" refer only to the four cases listed in the caption, that is, Case No. 17-cv-1532 JCS, *Base v. FCA US LLC* ("*Base*"), Case No. 17-cv-1541 JCS, *Valenzuela de Leon v. FCA US LLC* ("*Valenzuela*"), Case No. 17-cv-4042 JCS, *O'Brien v. FCA US LLC* ("*O'Brien*") and Case No. 17-4154 JCS, *Boyzo v. FCA US LLC* ("*Boyzo*").

[2] All of the parties in the related cases have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

with the TIPM-7, which was itself defective, and that they experienced a series of problems with their vehicles, requiring them to take the vehicles in for repair on numerous occasions. *Base* Complaint ¶¶ 10, 15, 96-98 (alleging that Plaintiff's vehicle was defective because of theTIPM-7 and had issues with the check engine light and "numerous recalls," and describing repair history); *Valenzuela* Complaint ¶¶ 14, 15, 95-97 (alleging that Plaintiffs' vehicle was defective because of the TIPM-7 and had issues with "non-starting" and irregular transmission shifts and describing repair history); *O'Brien* Complaint ¶¶ 10, 14, 15, 95-99 (alleging that Plaintiffs' vehicle was defective because of the TIPM-7 and had issues with irregular transmission shifts, extended crank times with no start and multiple recalls due to TIPM failures and describing repair history ); *Boyzo* Complaint ¶¶ 10, 15, 16, 96-98 (alleging that Plaintiffs' vehicle was defective because of the TIPM-7 and had issues with irregular engine noises, leaks, and forward jerking while driving and describing repair history).

Plaintiffs allege that FCA has been aware since at least 2007 that the TIPM-7 was defective, pointing to a series of recalls, internal technical service bulletins and consumer complaints related to problems caused by the TIPM-7. *See Base* Complaint ¶¶ 19-90; *Valenzuela* Complaint ¶¶ 18-89; *O'Brien* Complaint ¶¶ 18-89; *Boyzo* Complaint ¶¶ 19-89. They further allege that FCA did not disclose the TIPM-7 defects to them, or instruct dealers to disclose the defects to drivers or potential purchasers of vehicles equipped with the TIPM-7, either before they purchased their vehicles or after. *See Base* Complaint ¶¶ 91-95; *Valenzuela* Complaint ¶¶ 90-94; *O'Brien* Complaint ¶¶ 90-94; *Boyzo* Complaint ¶¶ 91-95.

In all of the related cases, Plaintiffs assert three claims. In Claim One, they assert a claim for breach of express warranties in violation of the Song-Beverly Act. This claim is based on allegations that: 1) the vehicles were delivered with serious defects and nonconformities; 2) the defects manifested themselves within the warranty period; 3) FCA was unable to conform the vehicles to its express warranties after a reasonable number of repair attempts; and 4) FCA did not promptly replace the vehicles with new vehicles or make restitution, as is required under the Song-Beverly Act. On this claim, Plaintiffs contend they are entitled to reimbursement of the price paid for the vehicles less the amount directly attributable to use by Plaintiffs prior to discovery of the

nonconformities, as well as consequential damages and attorneys' fees and costs. They also seek an award of a civil penalty under the Song-Beverly Act of up to two times the amount of actual damages on the basis that FCA willfully failed to comply with its obligations under the Song-Beverly Act.

In Claim Two, Plaintiffs assert a claim for breach of implied warranties in violation of the Song-Beverly Act on the basis that the vehicles were subject to an implied warranty that they were merchantable under California Civil Code section 1792. According to Plaintiffs, FCA breached this implied warranty by selling them vehicles that were not fit for the ordinary purpose for which such goods are used and which did not measure up to the promises or facts stated on the label because they were equipped with the defective TIPM-7. They allege that they are entitled to revoke acceptance of their vehicles, to rescission of the contract of sale pursuant to California Civil Code section 1794 and California Commercial Code section 2711, and to an award of "cover damages" and consequential damages.

In Claim Three, Plaintiffs assert a claim for fraudulent inducement/concealment based on allegations that FCA intentionally concealed a known defect from Plaintiffs when it sold them vehicles equipped with the TIPM-7. Plaintiffs further allege in support of this claim that FCA continues to conceal material information about the defects of the TIPM-7. Plaintiffs also allege that they relied on FCA's silence about the TPM-7 defects and that they could not have discovered them themselves because FCA kept testing information about the TIPM-7 confidential. On this claim, Plaintiffs seek compensatory and punitive damages.

## B. The Expert Reports

In each of the related cases, Plaintiffs have designated as expert witnesses Mr. Thomas Lepper and Dr. Barbara Luna, who have provided experts reports. According to his Curriculum Vitae, Mr. Lepper is a forensic automotive consultant. *See Boyzo*, Docket No. 58-2 at ECF p. 21 (Lepper CV). Dr. Luna specializes in forensic accounting. *See Boyzo* Docket No. 58-4 at ECF p. 3. As discussed further below, Mr. Lepper reviewed the repair records of Plaintiffs' vehicles (and in some cases inspected the vehicles), summarized the repair history of the vehicles, and expressed opinions about: 1) the impact the problems Plaintiffs experienced with their vehicles had on the

value of the vehicles; and 2) the connection between those problems and the TIPM-7 component in their vehicles. Dr. Luna addressed FCA's awareness of the TIPM-7 defects, although she did not express any opinions on the questions of whether the TIPM-7 was defective or caused the problems Plaintiffs experienced with their vehicles, instead deferring to Mr. Lepper on those questions.

### C. The Pending Motions

#### 1. The Summary Judgment Motions

FCA seeks partial summary judgment in the related cases on two primary grounds. First, FCA argues that Claim Three, for fraudulent inducement/concealment, should be dismissed because Plaintiffs have offered no evidence that FCA intentionally concealed a known defect in the TIPM in Plaintiffs' vehicles. According to FCA, in response to written discovery asking Plaintiffs to identify facts and produce documents supporting Claim Three, Plaintiffs failed to articulate any specific facts or identify or produce any documents showing that FCA had knowledge that the TIPM-7 component in Plaintiffs' vehicles were defective, either before or after Plaintiffs purchased their vehicles. FCA also asserts that neither the deposition testimony nor the opinions of Mr. Lepper are sufficient to create a fact issue as to whether the problems Plaintiffs had with their vehicles were caused by the TIPM-7. On the other hand, FCA points to opinions offered by its own expert, Stan Gozzi, that these problems were *not* related to the TIPM-7 component in their vehicles. Neither do the opinions of Plaintiffs' fraud expert, Dr. Luna, fill this gap, FCA asserts, because Dr. Luna relies on Mr. Lepper on the question of whether the TIPM-7 caused the problems with Plaintiffs' vehicles. Because there is no evidence to support Claim Three, FCA asserts, the Court should grant summary judgment on that claim in favor of FCA and should also grant summary judgment on Plaintiffs' request for punitive damages because such damages are sought only under Claim Three.[3]

Second, in *Base*, *Valenzuela* and *Boyzo*,[4] FCA argues that because it offered to pay

---

[3] At oral argument Plaintiffs stipulated that their request for punitive damages is based solely on Claim Three.

[4] In *O'Brien*, an inspection of the vehicle had not yet occurred at the time of the motion deadline

5

restitution to Plaintiffs soon after they filed their lawsuits, any violation of the Song-Beverly Act based on breach of express warranties cannot be willful, and therefore, Plaintiffs cannot recover a civil penalty on Claim One under California Civil Code section 1794(c). FCA notes that although a civil penalty may be awarded without willful conduct where a manufacturer does not "maintain[] a qualified third-party dispute resolution process which substantially complies with [Cal. Civ. Code] Section 1793.22," Plaintiffs did not assert claims for civil penalties on that theory in their complaints and therefore cannot assert such a claim in the related cases.

In response, Plaintiffs argue with respect to Claim Three that there is evidence of intentional concealment of the TIPM defect in FCA's own document production and that Plaintiffs were not required to disclose information in their discovery responses that FCA already possessed. In their Opposition briefs, Plaintiffs do not point to any specific documents or testimony to show that there is a genuine issue of material fact on this claim, asserting that FCA does not seriously dispute that FCA concealed a known defect with the TIPM. Plaintiffs also assert that the opinions of Dr. Luna and Mr. Lepper are sufficient to create genuine issues of material fact and therefore to preclude summary judgment on the fraudulent inducement claim.

With respect to Plaintiffs' request for a civil penalty under the Song-Beverly Act, Plaintiffs do not challenge FCA's assertion that they must demonstrate willfulness to recover such a penalty, stipulating at oral argument that they did not seek civil penalties under section 1794(c) in their complaints and therefore they have waived any claim to civil penalties under that section. They contend, however, there is sufficient evidence of willfulness to create a genuine dispute of material fact in all of the related cases. Plaintiffs also argue that FCA is prohibited from relying upon a Rule 68 Settlement offer to obtain summary judgment in its favor under Rule 408(a) of the Federal Rules of Evidence.

### 2. The Motions to Exclude

In the Motions to Exclude, FCA seeks to exclude under Rule 702 of the Federal Rules of

---

and no offer of restitution or replacement had been made. Therefore, FCA does not seek summary judgment on this basis in the *O'Brien* case.

Evidence and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) any opinion by Mr. Lepper that the issues involving Plaintiffs' vehicles were related to the TIPM-7 in the vehicles and that the TIPM-7 in Plaintiffs' vehicles were defective.[5] They assert that Mr. Lepper has no experience or expertise with TIPMs generally and that he offered no basis or methodology for his opinions that any of the problems or repairs on the vehicles were related to a defect in the TIPM-7. FCA also asks the Court to exclude the opinions of Dr. Luna because she has no knowledge or understanding of TIPMs and does not know if any of the repair issues experienced by Plaintiffs were related to the TIPM-7 in those vehicles. FCA argues that even if the Court does not exclude these opinions under Rule 702 and *Daubert*, it should exclude them under Rule 403 of the Federal Rules of Evidence on the basis that they are more confusing, misleading and prejudicial than they are probative.

## III.     THE MOTIONS TO EXCLUDE

### A.     Legal Standards Under Rule 702 of the Federal Rules of Evidence and *Daubert*

Under Rule 702 of the Federal Rules of Evidence, a witness may offer expert testimony if the following requirements are met:

> a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In determining whether expert testimony meets the requirements of Rule 702, courts follow the approach set forth in *Daubert v. Merrell Dow Pharms., Inc*., in which the Supreme Court described the relevant inquiry as follows:

> Faced with a proffer of expert scientific testimony, then, the trial judge must determine . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the

---

[5] FCA stipulated at oral argument that it does not seek to exclude Mr. Lepper's opinions about the repair history of the vehicles and the impact of the problems Plaintiffs experienced with their vehicles on the value of the vehicles so long as those opinions do not concern the TIPM-7 as the cause of the problems with Plaintiffs' vehicles.

testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

509 U.S. 579, 590 (1993).

With respect to the first requirement, that an expert must testify to "scientific knowledge," the Court in *Daubert* explained that "[t]he adjective 'scientific' implies a grounding in the methods and procedures of science . . . [while] the word 'knowledge' connotes more than subjective belief or unsupported speculation . . . [and] 'applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.'" *Id.* (quoting Webster's Third New International Dictionary 1252 (1986)). The Court declined to set forth a definitive test but offered some "general observations" about the types of factors that might be considered in determining whether this requirement is met. *Id.* at 593. These include: 1) whether the methodology can be or has been tested; 2) whether the theory and technique has been subjected to peer review; 3) if a "particular scientific technique" is involved, the known or potential rate of error; and 4) the degree of acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 592-94.

The Ninth Circuit has noted that the "scientific knowledge" requirement is usually met by "[e]stablishing that an expert's proffered testimony grows out of pre-litigation research or that the expert's research has been subjected to peer review." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995) ("*Daubert II*"). However, when such evidence is not available, the proponent's experts may satisfy this requirement by "explain[ing] precisely how they went about reaching their conclusions and point[ing] to some objective source – a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like – to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." *Id.* at 1319.

The second requirement under Rule 702, that expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue," "goes primarily to relevance." *Id.* at 591. This is a question of "fit," and "is not always obvious." *Daubert*, 509 U.S. at 591. The Court cautioned that "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Id.* To meet this requirement there must be "a valid scientific

connection to the pertinent inquiry." *Id.* In other words, the expert testimony must "logically advance[ ] a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315. This requirement is more stringent than the relevancy requirement of Rule 402 of the Federal Rules of Evidence, "reflecting the special dangers inherent in scientific expert testimony." *Jones v. U.S.*, 933 F. Supp. 894, 900 (N.D. Cal., 1996) (citing *Daubert*, 509 U.S. at 591; *Daubert II*, 43 F.3d at 1321 n. 17). In particular, expert testimony "'can be both powerful and quite misleading because of the difficulty in evaluating it.'" *Id.* (quoting *Daubert*, 509 U.S. at 595 (citation omitted)). "Therefore, a federal judge should exclude scientific expert testimony under the second prong of the *Daubert* standard unless he is 'convinced that it speaks clearly and directly to an issue in dispute in the case.'" *Id.* (quoting *Daubert II*, 43 F.3d at 1321 n. 17).

## B. The Opinions of Mr. Lepper

FCA challenges Mr. Lepper's opinions about the TIPM-7 component in Plaintiffs' vehicles on two grounds: 1) Mr. Lepper does not have specific expertise in TIPMs; and 2) his opinions are unreliable and speculative. Based on the experience reflected in Mr. Lepper's CV, the Court finds that Mr. Lepper is sufficiently qualified to offer expert opinions about the causes of the problems Plaintiffs experienced with their vehicles, including whether they were caused by defects associated with the TIPM-7. On the other hand, as to the *Base*, *Valenzuela* and *Boyzo* cases, Mr. Lepper's opinions about the TIPM-7 in Plaintiffs' vehicles and their connection to the problems Plaintiffs experienced are conclusory and speculative and are not based on any reliable methodology. Therefore, the Court GRANTS the motions to exclude as to the opinions of Mr. Lepper on the question of whether the TIPM-7 caused the problems Plaintiffs had with their vehicles in those cases.

### 1. *Base*

In *Base*, Mr. Lepper's expert report begins with the following description of the assignment Plaintiffs asked Mr. Lepper to perform:

> We were assigned to review documentation followed by an inspection [of] photographs involving Galen R. Base's . . . 2012 Dodge Ram 2500 . . . and determine if the repairs performed as described in the supplied repair orders and observed in the physical inspection indicate ongoing manufacturing defects that could substantially impair the

value, use or safety of the vehicle prior to its purchase on December 16, 2012.

Shepardson Decl. (*Base* Motion to Exclude), Ex. 1 (Lepper Expert Report (*Base*)) at 3.[6] From this description, it is not clear that Plaintiffs even asked Mr. Lepper to consider whether the repairs on their vehicle were related to the TIPM-7 installed in it.

Nor did Mr. Lepper express any clear opinions on that question in his report. Rather, the three-paragraph "Conclusions" section that follows his description of the assignment makes only a cryptic statement about the possible role of the TIPM-7. The "Conclusions" are reproduced in their entirety below:

> A continuous safety and emissions problem associated with the subject 2012 Dodge Ram 2500 was documented repeatedly throughout Galen Base's ownership of the vehicle. An electrical problem within the Oxygen sensor system and other issues were addressed on multiple visits to various FCA dealers.

> The Oxygen sensor system displayed faults that were brought to the attention of the FCA dealership and verified by the dealerships. The attempted repair services performed by the dealerships were ineffective in resolving this issue.

> *The power flowing through the Oxygen sensor system is controlled by the Totally Integrated Power Mode (TIPM), which is the distribution box for nearly the entire electrical system within the subject vehicle. The inability of the various FCA dealers, with and without the assistance of Fiat Chrysler (FCA), STAR, and Cummins indicates that the power supply from the TIPM has been, and still is, a complex electrical problem.*

*Id.* at 3-4 (emphasis added). Similarly, the declaration of Mr. Lepper supplied in support of Plaintiff Base's opposition brief, *see* Case No. C-17-1532, Docket No. 76-1, does not state that TIPM-7 caused the problems Plaintiff Base experienced with his vehicle.

Further, to the extent Mr. Lepper's vague statement about the TIPM in his report can even be construed as an opinion that the TIPM-7 in Plaintiff's vehicle caused the problems he experienced with it, that opinion is supported by no specific facts linking the repairs that were performed on Plaintiff's vehicle to the TIPM-7. Rather, the brief opinions offered by Mr. Lepper

---

[6] Although Mr. Lepper's sentence, as written in the report, is ambiguous, the Court has inserted the word "of" based on Mr. Lepper's description of the inspection, *see* Shepardson Decl. (*Base* Motion to Exclude), Ex. 1 (Lepper Expert Report (*Base*)) at 49-50, indicating that Mr. Lepper's inspection involved only a review of photographs that had been taken of the vehicle and that he did not conduct the inspection himself.

for each repair make no mention of the TIPM-7; nor do they address the underlying causes of the problems that required repair. *See, e.g., id*. at 7 ("The is [sic] the first water leak repair. Water leaking into the cab can cause many problems such as corrosion and possible short-circuits in the wiring harness and enhancement of conditions conductive [sic] to the formation of mold."); 8 ("The is [sic] the first Oxygen sensor repair. When the P2271 code has set, the emissions might not meet either Federal emission standards or California Air Resources Board Standards"); 9 ("The [sic] could be the second Oxygen sensor problem. When the Check Engine Light is ON, the emissions might not meet either Federal emission standards or California Air Resources Board Standards.").

Likewise, Plaintiff Base has pointed to no deposition testimony by Mr. Lepper that explains how he reached his conclusions with respect to the TIPM-7 in Plaintiff's vehicle. To the contrary, at his deposition Mr. Lepper acknowledged that the oxygen sensor problems with Plaintiff Base's vehicle could have been related to the power supply but might, in the alternative, have been the result of bad oxygen sensors, poor repair work or "programming reasons." Shepardson Decl. (*Base* Motion to Exclude), Ex. 2 (Lepper Dep.) at 32. Mr. Lepper opined that these possibilities "should have been investigated" but did not testify that it was more likely than not that the oxygen sensor problem was caused by the power supply. *Id*. He testified further that a test could have been performed to test the amperage and volts that were being supplied to the oxygen sensor controller and to each oxygen sensor to see if there was a "common cause" for the repeated problems with the oxygen sensor, but that neither he nor anyone else performed that test. *Id*.

In light of the vague nature of Mr. Lepper's statement about the TIPM in his report and the absence of specific facts supporting that statement in the record, the Court finds that Mr. Lepper's opinions linking the TIPM-7 to the problems with Plaintiff's vehicle do not meet the "scientific knowledge" requirement of *Daubert*. In particular, in the absence of any explanation of how Mr. Lepper reached his conclusion, it is not clear that it is the product of reliable principles and methods, as is required under *Daubert*. Nor is does the Court find persuasive Plaintiffs' assertion in their Opposition brief that Mr. Lepper's methodology is reliable because he has done what all

11

"lemon law experts" do, namely, review the repair records for the vehicle, documents about "known issues in the same (or similar) model vehicle or its components," and the report of the opposing expert and "filter[ ] all that information through the lens of automotive knowledge and experience to arrive at an opinion that is grounded on factual data." Opposition at 8. This argument suggests that so long as an individual has sufficient expertise to address an issue it is permissible to offer ultimate conclusions on that subject without offering any explanation of how the expert's opinions were reached or the methodology that was used. That is not the law. Accordingly, Mr. Lepper may not offer any testimony in the *Base* case on the question of whether the TIPM-7 in Plaintiff's vehicle was the cause of the problems he experienced with the vehicle.

### 2. *Valenzuela*

In *Valenzuela*, Mr. Lepper was asked to review the repair history of Plaintiffs' vehicle to "determine if the repairs performed as described in the supplied repair orders indicate an ongoing manufacturing defect involving the Totally Integrated Power Modul (TIPM) that could substantially impair the value, use, or safety of the vehicle prior to its purchase on September 20, 2014." Shepardson Decl. (*Valenzuela* Motion to Exclude), Ex. 1 (Lepper Expert Report (*Valenzuela*)) at 3. Mr. Lepper's conclusions in the *Valenzuela* case are as follows:

> A review of the supplied documentation indicates that the 2014 Jeep Wrangler Unlimited, was hampered by various electrical based malfunctions due to the unsteady supply of power through the Totally Integrated Power Module (TIPM) to the various electrical systems in the vehicle. The number of repairs and the repeated repairs brings into clear vision how untrustworthy and dangerous the Fiat/Chrysler TIPM is in everyday driving situations.

> Most of the electrical power in the 2014 Jeep Wrangler Unlimited is controlled through the TIPM, which is the power distribution box for nearly the entire electrical system within the subject vehicle. The inability of San Leandro Chrysler Dodge Jeep Ram, with and without the assistance of Fiat Chrysler (FCA) and STAR, indicates that the TIPM has been, and still is a complex and dangerous electrical problem.

> While this vehicle was not subject to the TIPM Recalls, the problems exhibited indicate that the TIPM in this vehicle should have been diagnosed, examined or replaced.

*Id*. at 3-4.

While somewhat more definite than the statements in *Base* discussed above, the

conclusions offered by Mr. Lepper in *Valenzuela* are, nonetheless, extremely vague with respect to whether the TIPM-7 in *Plaintiffs' vehicle* actually caused the specific problems that they experienced. The declaration of Mr. Lepper offered in support of the *Valenzuela* Plaintiffs' opposition brief also does not state that it is more likely than not that the TIPM-7 in their vehicle caused the problems they experienced. *See* Case No. C-17-1541, Docket No. 74-1. Moreover, the only further opinion Mr. Lepper supplied on this question in his report was that problems with "hard starting" "*could* be traced to the unsteady power supply through the TIPM." *Id.* at 6, 18 (emphasis added). Similarly, he opined in his deposition only that the problems the Valenzuelas experienced with their vehicle "could be" caused by the TIPM. *See* Shepardson Decl. (*Valenzuela* Motion to Exclude), Ex. 2 (Lepper Dep.) at 41. He also testified that he had "developed a theory" of what would cause the problems the Valenzuelas experienced but conceded that he had performed no tests to determine the cause of the problems. *Id.* at 25. Nor did Mr. Lepper provide details about his "theory" showing that it satisfied the requirements of *Daubert* and Rule 702 of the Federal Rules of Evidence.

As in *Base*, Mr. Lepper has offered no explanation in *Valenzuela* of how he reached his conclusion and as a consequence, it is impossible to determine whether his opinions are the result of reliable methods and principles. Furthermore, to the extent that the opinion Mr. Lepper expresses is only that a link between the TIPM-7 and Plaintiffs' vehicle is a *possibility,* that testimony would not does not satisfy the "fit" requirement of *Daubert* because expert opinion must "logically advance[ ] a material aspect of the proposing party's case" and testimony that the TIPM-7 *might* cause the problems Plaintiffs experienced will not do that. Consequently, Mr. Lepper's opinion that the TIPM-7 caused the problems with Plaintiffs' vehicle does not meet the requirements of *Daubert.*

### 3. *Boyzo*

In *Boyzo*, Mr. Lepper's description of his assignment is virtually identical to the description in *Base*, with no express reference to the TIPM-7 or whether that component caused the problems the Boyzos had with their vehicle. Shepardson Decl. (*Boyzo* Motion to Exclude), Ex. 1 (Lepper Expert Report (*Boyzo*)) at 3. The "Conclusions" state that Plaintiffs' vehicle "*could*

*have been* hampered by electrical based malfunctions caused by the Totally Integrated Power Mode [sic] (TIPM) unsteady supply of power to the electrical system of the automatic transmission." *Id.* (emphasis added). Mr. Lepper goes on to opine:

> Most of the electrical power is controlled by the Totally Integrated Power Mode [sic] (TIPM), which is the electrical distribution unit for nearly the entire electrical system within the subject vehicle. The inability of Normandin Dodge Chrysler Jeep Ram, with and without the assistance of Fiat Chrysler (FCA) and STAR, indicates that the vehicle has been, and still presents complex electrical problems.

*Id.* at 4. In *Boyzo*, as in *Base* and *Valenzuela*, Mr. Lepper's conclusion is vague and to the extent he even finds that the TIPM-7 caused the problems the *Boyzo* Plaintiffs experienced, he offers no supporting facts or explanation of how he arrived at his conclusion in his report. And as in *Base* and *Valenzuela*, neither his deposition testimony nor his opposition declaration fills in these gaps. In the *Boyzo* deposition, as in the other cases, Mr. Lepper testified only that the transmission problems the Boyzos experienced with their vehicle "could" have been caused by the power supply. Shepardson Decl. (*Boyzo*), Ex. 2 (Lepper Dep.) at 43. Mr. Lepper's opposition declaration also does not state that the TIPM-7 in the Boyzo's vehicle caused the problems they experienced with it. *See* Case No. C-17-4154, Docket No. 59-1.

The Court finds that in *Boyzo*, as in *Valenzuela* and *Base*, Mr. Lepper's opinions linking the TIPM-7 to the problems Plaintiffs experienced do not satisfy *Daubert* and Rule 702 of the Federal Rules of Evidence. There is nothing in his report showing that his opinions are the result of reliable principles and methods. Moreover, the opinions will not assist the jury as Mr. Lepper only opines that the TIPM-7 *might* have the problems Plaintiffs experienced.

### 4. *O'Brien*

In this case, FCA brings a motion to exclude even though Mr. Lepper has not yet produced an expert report or been deposed. The deadline for expert disclosures, including expert reports, in all of the related cases was November 19, 2018. *See* Case No. 17-4042, Docket No. 57. The close of expert discovery was December 28, 2019. These deadlines were set to allow sufficient time to conduct motion practice, including *Daubert* motions, before the scheduled trials. The first of these trials is in the *O'Brien* case and is set to commence on May 28, 2019. Under

14

Rule 26(a)(2)(B)(i) of the Federal Rules of Civil Procedure, the *O'Brien* Plaintiffs were required to produce an expert report that included, among other things, "a complete statement of all opinions [Mr. Lepper] will express and the basis and reasons for them" and "the facts or data considered by [Mr. Lepper] in forming [these opinions.]"  As the deadline has now passed and Plaintiffs have not asked for or been granted an extension of the expert discovery deadlines in the case, Mr. Lepper may not offer **any** opinions in the *O'Brien* case.  Therefore, the Motion to Exclude in *O'Brien* is GRANTED and Mr. Lepper will not be permitted to testify as an expert in that case.

### C.    The Opinions of Dr. Luna

In all of the related cases, Dr. Luna offers opinions about whether FCA concealed known defects with the TIPM.  However, she deferred to Mr. Lepper on the question of whether the TIPM-7 is defective and whether the TIPM-7 in Plaintiffs' vehicles did, in fact, cause the problems they experienced.  Because the Court finds that Mr. Lepper's opinions on that subject do not pass muster, the report of Dr. Luna also must be excluded under *Daubert* because the premise of Dr. Luna's reports in all of the related cases is that the TIPM-7 was the cause of the problems Plaintiffs experienced.   Without a reliable basis for that assumption, her opinions that FCA concealed information related to Plaintiffs' vehicles is also unreliable.   Therefore, the motions to exclude are GRANTED as to the opinions of Dr. Luna.

## IV.    THE SUMMARY JUDGMENT MOTIONS

### A.    Legal Standard Under Rule 56 of the Federal Rules of Civil Procedure

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id*.  On summary judgment, the court

draws all reasonable factual inferences in favor of the non-movant. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Neither conclusory, speculative testimony in affidavits nor arguments in moving papers are sufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979). A party need not present evidence to support or oppose a motion for summary judgment in a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable to presentation in an admissible form. *See Fraser v. Goodale*, 342 F.3d 1032, 1036−37 (9th Cir. 2003).

### B. Whether FCA is entitled to Summary Judgment on Claim Three

One of the elements for fraud and deceit based on concealment is that the defendant must have intentionally concealed or suppressed a material fact with the intent to defraud the plaintiff. *See Moncada v. W. Coast Quartz Corp.*, 221 Cal. App. 4th 768, 775 (2013) (quoting *Marketing West, Inc. v. Sanyo Fisher (USA) Corp.*, 6 Cal.App.4th 603, 612-613 (1992)). FCA contends Claim Three, for fraudulent inducement/concealment should be dismissed because Plaintiffs have not demonstrated that there is a material dispute of fact on the question of whether FCA intentionally concealed facts from Plaintiffs with the intent to defraud them. The Court agrees.

In order to survive summary judgment on the question of whether FCA intentionally concealed a material fact with the intent to defraud Plaintiffs, Plaintiffs must point to evidence that FCA knew that the TIPM-7 component *in Plaintiffs' vehicles* was defective. FCA has introduced the testimony of its own expert, Stan Gozzi, that "TIPMs are specific to each Chrysler vehicle" and "[t]here is no defect common to all TIPMs in all vehicles manufactured by [FCA]." Gozzi Decl. (*Boyzo*) ¶ 6; *see also* Gozzi Decl. (*O'Brien*) ¶¶ 5-6 (explaining that TIPM is specific to each make and model of Chrysler vehicle because it "must be configured to match the electrical components of the vehicle" and the software in it must be configured to the software of the make and model of the vehicle and the options specific to the vehicle; also explaining that the location of the TIPM in the engine department varies between Chrysler vehicles and that the TIPM must be specially designed for the location); Gozzi Decl. (*Valenzuela*) ¶¶ 4, 6 (same); Gozzi Decl. (*Base*) ¶¶ 4, 6 (same). Plaintiffs do not point to any evidence or testimony to the contrary. Consequently, Plaintiffs cannot rely on evidence that TIPMs in other Chrysler vehicles were defective to show

that the TIPM-7 in their own vehicles caused the problems they experienced. Rather, they must point to evidence sufficient to create a question for the jury that the TIPM-7 in their particular vehicles were defective. They have not done so.

Plaintiffs do not point to any specific documents showing that FCA knew the TIPM-7 in their vehicles was defective. Rather, they contend Mr. Lepper's expert testimony is sufficient to demonstrate that there is a material issue of fact. This argument fails because Mr. Lepper's expert opinions do not satisfy *Daubert* and Rule 702 for the reasons discussed above. Accordingly, the Court concludes that FCA is entitled to summary judgment in its favor on Claim Three in all of the related cases. The Court dismisses Claim Three with prejudice and grants summary judgment in FCA's favor with respect to the request for punitive damages.

### C. Whether FCA is entitled to Summary Judgment on the Request for a Civil Penalty on Claim One

Plaintiffs seek civil penalties under Cal. Civ. Code section 1794(c), which provides for civil penalties for consumers of goods who were damaged by the manufacturer's failure to comply with any obligation under the Song-Beverly Act, or under an implied or express warranty. Cal. Civ. Code § 1794(a). In order to collect civil penalties under subsection (c), the buyer must establish that the defendant's failure to comply with the Act was willful.

Plaintiffs allege that FCA willfully failed to comply with Cal. Civ. Code section 1793.2(d)(2), which provides, in relevant part, that "[i]f the manufacturer or its representative . . . is unable to service or repair a new motor vehicle . . . to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle . . . or promptly make restitution to the buyer . . . ." FCA, however, asserts in *Base*, *Boyzo* and *Valenzuela* that as a matter of law, its conduct was not willful because in all three cases it offered to repurchase the vehicles soon after litigation commenced. Defendants rely on *Hatami v. Kia Motors Am., Inc.*, No. 08-0226, 2009 WL 1396358 (C.D. Cal. Apr. 20, 2009) and *Dominguez v. Am. Suzuki Motor Corp.*, 160 Cal. App. 4th 53, 60 (2008). For the reasons set forth below, the Court finds that there are questions of fact in *Base* that preclude summary judgment as to the availability of a civil penalty under section 1794(c) but that in *Boyzo* and

*Valenzuela* Plaintiffs have not established a material issue of fact.[7]

As a general rule, whether a manufacturer willfully violated its obligation to repair the car or refund the purchase price is a factual question for the jury. *Oregel v. Am. Isuzu Motors, Inc.*, 90 Cal. App. 4th 1094, 1104 (2001) (citing *Jensen v. BMW of North America, Inc.*, 35 Cal.App.4th 112, 134-136 (1995)). To establish that a violation of the Song-Beverly Act was willful, a plaintiff is not required to establish "blame, malice or moral delinquency." *Schreidel v. Am. Honda Motor Co.*, 34 Cal. App. 4th 1242, 1250 (1995) (citing *Ibrahim v. Ford Motor Co.*, 214 Cal. App. 3d 878, 894 (1989)). Further, the standard "does not require the plaintiff to prove the defendant actually knew of its obligation to refund or replace" a vehicle when attempts to repair the vehicle have failed as manufacturers are required to maintain service and repair facilities in the state and are therefore "capable of knowing every failed repair attempt by reading the dealer's service records." *Robinson v. Kia Motors Am., Inc.*, No. 10-3187, 2011 WL 1459016, at *5 (E.D. Cal. Apr. 15, 2011) (citing *Kwan v. Mercedes-Benz of N. Am., Inc.*, 23 Cal. App. 4th 174, 185 (1994)). In addition to the repair history of the vehicle, policies on the part of a manufacturer that are inconsistent with its obligation under the Song-Beverly Act to promptly repair and replace after a reasonable number of repair attempts have failed may also support a finding of willfulness. *See Oregel*, 90 Cal. App. 4th at 1105. "However, 'a violation is not willful if the defendant's failure to replace or refund was the result of a good faith and reasonable belief the facts imposing the statutory obligation were not present.'" *Schreidel*, 34 Cal. App. 4th at 1250 (quoting *Kwan*, 23 Cal. App. 4th at 185).

Although willfulness is usually a factual question for the jury, in *Hatami* and *Dominguez*, cited by FCA, the courts granted summary judgment in favor of the manufacturers with respect to civil penalties under section 1794(c) on the basis that there was no evidence that the manufacturers had acted willfully. In *Hatami*, the court granted summary judgment in favor of a manufacturer on

---

[7] The Court rejects Plaintiffs' assertion that FCA is barred under Rule 408 of the Federal Rules of Evidence from introducing evidence of its offers to repurchase Plaintiffs' vehicles. Rule 408 prohibits parties from introducing offers of compromise to prove or disprove the validity of a claim but makes an exception for evidence offered for another purpose, including "negating a contention of undue delay." Fed. R. Evid. 408. As FCA introduces evidence of its offers to pay restitution to show that it acted "promptly" that exception applies here.

a claim for civil penalties under section 1794(c) where the owner of the vehicle alleged that he made five attempts to have his vehicle repaired during the warranty period and then demanded, through counsel, that the defendant replace the vehicle. *Hatami*, 2009 WL 1396358, at *1. Although the manufacturer offered to inspect and repair the vehicle, the plaintiff did not respond to the offer, instead initiation litigation within six weeks of the earlier demand for replacement. *Id*. Within another two months, and before discovery in the action had commenced, the manufacturer had offered to repurchase the vehicle and pay the plaintiff's attorney fees. *Id*. A month later, the manufacturer offered to buy the vehicle back at a higher price. *Id*. Under those circumstances, the court found that there was a material dispute of facts as to whether the offer to repurchase the vehicle was made "promptly" as required by Section 1793.2(d)(2), but that the manufacturer was entitled to summary judgment that its conduct was not willful. *Id*. at *3, 5.

The *Hatami* court found that the manufacturer did not act willfully, as a matter of law, because there had been two buy-back offers and the timing of the offers was consistent with the manufacturer's assertion that it "wanted to ensure that the vehicle truly was non-conforming and that restitution was applicable." *Id*. at *5. The court noted that "[a]lthough Plaintiff did demand restitution and Defendants initially responded with a request for further repair, this does not create a genuine issue of material fact. Rather, the Court finds willful conduct absent as Defendants initial response to Plaintiff's request and subsequent buy back offers do not evidence an intent to avoid fulfilling its duty under the Song-Beverly Act." *Id*.

In *Dominguez*, the California Court of Appeal found that the trial court had erred in denying summary judgment in favor of the manufacturer on the issue of willfulness under section 1794(c). There, the plaintiff purchased a new motorcycle from Suzuki in November 2004 and began to experience problems with it within a few days. *Dominguez v. Am. Suzuki Motor Corp.*, 160 Cal. App. 4th 53, 55 (2008), as modified on denial of reh'g (Mar. 10, 2008), as modified (Apr. 3, 2008). He called Suzuki's customer service line but the representative terminated the call when Dominguez became verbally abusive. *Id*. Over the six months that followed, Dominguez took the motorcycle to Suzuki-authorized service and repair facilities on at least five occasions. *Id*. On June 13, 2005, Dominguez's attorney sent a letter to Suzuki demanding that it "repurchase or

replace the [motorcycle] and pay his attorney fees and costs." *Id.* A week later, on June 21, 2005, Suzuki sent a letter to the attorney explaining why its customer service representative had ended the call with Dominguez and stating "that the repair mechanics were never able to duplicate the reported problem, the excessive mileage on the Motorcycle did not indicate there was a 'recurrent problem[,]' and Dominguez brought in the [m]otorcycle for issues unrelated to the alleged problem." *Id.* at 56. The letter went on to request that Dominguez bring the motorcycle "to an authorized Suzuki dealer of his choosing to have a technical service manager inspect and repair the Motorcycle to resolve the matter." *Id.* A month later Suzuki offered to buy back the motorcycle for the purchase price, and a month after that it also offered $750 in attorneys' fees, rejecting the request by Dominguez's counsel for $2,500 in fees on the basis that he had only written a letter. *Id.* When Suzuki refused to pay a higher amount in fees on the basis that the attorney had not actually incurred the fees he sought, Dominguez filed an action under the Song-Beverly Act, including a claim for civil penalties under section 1794(c). *Id.*

The court found that Suzuki had complied with the requirements of the Song-Beverly Act before the action was even filed and that the purpose of the suit was only to recover the civil penalty under section 1794(c). *Id.* at 60. It further found that there was no evidence that the manufacturer acted willfully, relying heavily on the fact that only six weeks elapsed between the time Dominguez requested replacement and the time Suzuki made its first offer to repurchase the motorcycle. *Id.* The court further relied on the fact that Dominguez had not complained that the number of attempts to repair the vehicle (five) was unreasonable. *Id.*

On the other hand, in *Robinson v. Kia Motors Am., Inc.*, No. 10-3187, 2011 WL 1459016 (E.D. Cal. Apr. 15, 2011), the court found that there was a material dispute of fact on the question of whether the manufacturer had engaged in willful conduct for the purposes of section 1794(c), distinguishing *Hatami* and *Dominguez*. There, the plaintiff began to experience problems with her vehicle within the warranty period and took her vehicle for repair five times in a month. 2011 WL 1459016, at *1. None of the repair attempts was successful and the notes from the fifth visit reflect that the dealer did not know what was wrong with the vehicle. *Id.* After the fifth visit, the plaintiff contacted the manufacturer and requested a buy-back under the Song-Beverly Act, saying

she did not want to keep bringing the vehicle in for repair. *Id*. The customer service agent told the plaintiff she would have to pursue her "lemon law" claim in arbitration. *Id*. Soon after that, another agent called and scheduled a vehicle inspection. *Id*. Although the plaintiff initially agreed to the inspection, she canceled the inspection before the scheduled date saying that she did not want to keep bringing the vehicle in for repairs. *Id*. At that point, the agent called plaintiff and told her that the vehicle was not a lemon and would not be replaced. *Id*. The plaintiff then initiated a lawsuit under the Song-Berly Act. *Id*.

In addressing the manufacturer's request for summary judgment on the claim for civil penalties under section 1794(c), the court in *Robinson* emphasized that "[t]he question addressed at this stage is not whether Defendant was in fact willful and subject to § 1794(c) civil penalties, but instead, whether a reasonable jury could find that it acted willfully." *Id*. at *5. It also noted that "case law in this area is highly fact-specific, and one or two slight differences between cases can change the outcome." *Id*. The court found that there was a material issue of fact on the question of willfulness. *Id*. It pointed out that in contrast to *Dominquez*, where the problem could not be duplicated and there was evidence that the problems were due to excessive wear, the record in *Robinson* reflected that the mechanics who tried to repair the vehicle recognized the problem and did not know what was wrong with the vehicle. *Id*. As the agent in *Robinson* who scheduled the inspection had access to the service records, the court found that a jury could reasonably conclude the inspection requirement was not a product of good faith, unlike in *Dominguez*. *Id*. It pointed out that manufacturers are charged with knowledge of the repair history of a vehicle for the purposes of determining wither conduct was willful. *Id*. at *5 (citing *Krotin v. Porsche Cars N. Am., Inc.*, 38 Cal. App. 4th 294, 303 (1995)). The court also distinguished *Hatami* on the basis that in *Hatami*, the manufacturer had offered to repurchase the vehicle whereas in *Robinson* the manufacturer had not made such an offer. *Id*. at *4.

In *Boyzo*, Plaintiffs have offered evidence that they took their vehicle in for repair five times between the time they purchased their Dodge Caravan, in 2013, and March 15, 2017. *See* Lepper Decl. (*Boyzo*) ¶¶ 7, 8 & Lepper Report (*Boyzo*), attached as Exhibit A. They filed their complaint on March 30, 2017. On June 6, 2017 FCA served an offer of compromise of $50,000

plus reasonable attorneys' fees and costs.  Shepardson Decl. (*Boyzo*) ¶ 3 & Ex. A.  According to FCA, the total cost of the vehicle, including all finance charges, was $39,998.53.  *Id.*  Plaintiffs have not disputed that amount or presented any evidence to the contrary.  It is also undisputed that prior to initiating this action the Boyzos never requested that FCA buy back their vehicle.  The Court finds the facts of this case are similar to those in *Hatami* and *Dominguez* and that Plaintiffs have not offered evidence from which a reasonable jury could conclude that FCA acted willfully with respect to the timing of its offer to buy back Plaintiffs' vehicle, even if a jury might conclude that it did not do so promptly.

The Court reaches the same conclusion in *Valenzuela*.  In that case, the evidence shows that Plaintiffs took their vehicle in for repair five times between the time they purchased their Jeep Wrangler, in September 2014, and April 2, 2016.  Rozensweig Decl. (*Boyzo*) ¶¶ 3-9.  In addition, Plaintiff Jessica Fuentes Valenzuela testified at her deposition that she called Chrysler on a number of occasions to inform them of the difficulties they were having with their vehicle and their dissatisfaction with it.  Rozensweig Decl., Ex. F (Valenzuela Dep.) at 73-74.  There is no evidence in the record that Plaintiffs requested reimbursement or replacement prior to filing their lawsuit against FCA, on November 22, 2016.  On February 8, 2017, FCA served an Offer to Compromise in the amount of $67,000 plus reasonable attorneys' fees and costs.  Shepardson Decl. (*Valenzuela*) ¶ 3 & Ex. A.  While the evidence shows that FCA was aware of the problems the *Valenzuela* Plaintiffs were experiencing with their vehicle, there is nothing in the record that would support the conclusion that FCA was intentionally avoiding its obligations under the FCA. Again, this case is similar to *Hatami* and *Dominguez*.

On the other hand, there is sufficient evidence in the record in *Base* to create a jury question as to FCA's willfulness.  In that case, Plaintiff took his Dodge Ram in for repairs eight times between the time he purchased it, in December 2012, and December 8, 2015, when Plaintiff contacted FCA and asked that it be repaired or replaced.  *See* Higgins Decl. (*Base*) ¶¶ 9-18.  At that point, his concerns were "escalated" but he continued to experience problems with the vehicle, with two more repair visits in December 2015 and January 2016.  *Id.* ¶ 20, 21.  On January 28, 2016, FCA sent Plaintiff a letter that did not offer to replace the vehicle or to pay

22

restitution, instead offering him $1,500 for a release from all liability for the problems he was experiencing. *Id.* ¶ 22 & Ex. S. On October 21, 2016, Plaintiff initiated this action and on November 16, 2016 FCA made an Offer of Compromise in the amount of $50,012.56 plus reasonable attorneys' fees and costs. Shepardson Decl. (*Base*) ¶ 3 & Ex. A. The evidence that Plaintiff in *Base* had to take his vehicle in for so many repairs, and the fact that FCA's escalation process resulted only in an offer to pay $1,500 despite the repeated repair attempts are sufficient to distinguish this case from *Hatami* and *Dominguez* and create a question for the jury as to whether FCA's conduct was willful.

## V.    CONCLUSION

The Court's rulings are as follows. First, the Court GRANTS the motions to exclude in all of the related cases and therefore excludes: 1) opinion testimony by Mr. Lepper regarding whether the TIPM-7 in each vehicle was defective, and linking the TIPM-7 to the problems Plaintiffs experienced with their vehicles; and 2) opinion testimony by Dr. Luna that FCA intentionally concealed from Plaintiffs the defects associated with the TIPM-7. In addition, Mr. Lepper may not offer any expert opinions in *O'Brien* because no expert report was produced in that case and the deadline to do so has now passed.

Second, the Court GRANTS the summary judgment motions with respect to Claim Three, for fraudulent concealment, which is dismissed in all of the related cases. Because Claim Three is dismissed, Plaintiffs also may not seek punitive damages in any of the related cases. With respect to FCA's request for summary judgment in *Boyzo*, *Valenzuela*, and *Base* on Plaintiffs' request for civil penalties under Cal. Civ. Code section 1794(c), the motion is GRANTED as to *Boyzo* and *Valenzuela* and DENIED as to *Base*.

**IT IS SO ORDERED.**

Dated: March 11, 2019

_____
JOSEPH C. SPERO
Chief Magistrate Judge